IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROSALYN STRONG, ex. rel., M.H., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11 CV 5922 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Rosalyn Strong ("plaintiff" or "Ms. Strong"), has filed a motion for summary judgment [18] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), pursuant to 42 U.S.C. § 1383(c)(3). Ms. Strong pursues disability benefits on behalf of her minor child, M.H., under Title XVI of the Social Security Act. For the reasons set forth below, plaintiff's motion for summary judgment [18] is granted in part and denied in part, and the case is remanded for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Ms. Strong filled an application for supplemental security income ("SSI") on behalf of M.H. based on M.H. having "behavior problems." (R. 115-20, 144.)[1] That application alleged a disability onset date of May 7, 2008, and was denied initially and upon reconsideration. (R. 112, 43-45, 50-53.) In response to those denials, Ms. Strong

---

[1] Shortly thereafter, M.H. was diagnosed with Attention Deficient Hyperactivity Disorder ("ADHD"), on May 28, 2008. (R. 182.)

sought a hearing, at which she and M.H. appeared with counsel on September 15, 2010.  (R. 30-40.)  The Administrative Law Judge ("ALJ") Kenneth E. Stewart denied Ms. Strong's claim in an opinion dated October 8, 2010.  (R. 13-29.)  The Appeals Council denied Ms. Strong's request for review (R. 1, 11-12), and Ms. Strong filed a timely appeal to this Court.  The parties have consented to our jurisdiction pursuant to 28 U.S.C. § 636(c) [9].

## II.    FACTUAL BACKGROUND

M.H. was born on November 24, 1999.  (R. 112.)  M.H.'s ADHD is the primary diagnosis that forms the basis of her current SSI application.  (R. 41, 42.)

### A.    Medical and Other History

Between December 2007 and May 2008, while in the second grade, M.H. received ten disciplinary referrals from her school.  (R. 151-61.)  M.H.'s school reported several types of problems, including multiple instances of fighting or bullying (R. 152-55), an inability to sit still (R. 157, 159, 161), and other misconduct with an inability to explain her actions.  (R. 156, 160.)

On May 7, 2008, M.H.'s teacher, Heather Hop, wrote that M.H. often makes comments regarding other students' race or other inappropriate topics.  (R. 163.)  Ms. Hop reported having to speak with M.H. or separate her from other children two or three times a week because of something she said.  (*Id.*)  Ms. Hop indicated that outside help would be beneficial for M.H.  (*Id.*)  On May 15, Ms. Hop wrote: "[M.H.]'s behavior is getting out of hand.  She is constantly being disrespectful to other students in the classroom.  She is saying mean things to them and then says she didn't say anything.  She also rolls her eyes at me when I correct her or mutters something under her breath.

2

I've tried taking away privileges but it doesn't seem to matter to her.  I've also tried removing her from the situation but when she returns the behavior continues and sometimes gets worse."  (R. 151.)

On May 16, 2008, Ms. Strong completed disability and function reports regarding M.H. for the Social Security Administration's Bureau of Disability Determination Services ("DDS").  (R. 128-39, 143-49.)  Ms. Strong reported that M.H.'s abilities to communicate and progress in learning were limited, and that M.H. "is constantly getting referrals for being rude and not sitting in her desk."  (R. 133-34, 148.)  She noted that M.H. cannot explain why she does things and that she is "very active.  At time's when she has no reasons to be [sic]."  (R. 134.)  Ms. Strong also reported that, as a result of her impairments, M.H. does not get along well with adults or her teachers, has trouble taking care of her personal needs, and "tends to give up on things very fast."  (R. 136-38.)  Ms. Strong also reported that when M.H. "play's with her dolls she say very mean things that is out of hand [sic]."  (R. 138.)

On May 27, 2008, Ms. Hop completed a "Teacher Questionnaire" for DDS.  (R. 168-75.)  At the time, Ms. Hop had known M.H. for nine months and had spent five hours a day with her.  (R. 168.)  Ms. Hop rated M.H.'s reading skills as above grade level, her math skills as below grade level, and her written language skills as at grade level.  (*Id.*)  Ms. Hop also rated M.H.'s performance in the six domains of functioning relevant to childhood disability determinations, on a scale of one to five, one being "no problem," two being "a slight problem," three being "an obvious problem," four "a serious problem," and five "a very serious problem."  (R. 169-73.)  In the domain of Acquiring and Using Information, which consisted of ten performance categories, Ms.

3

Hop found that M.H. had "an obvious problem" in one category and "no problem" in nine

categories. (R. 169.) In the domain of Attending and Completing Tasks, consisting of

thirteen performance categories, Ms. Hop found that M.H. had "an obvious problem," on

a daily basis, in two categories and "no problem" in eleven categories. (R. 170.) Ms.

Hop noted that M.H.'s behavior in this category "often create[d] a disruption in the

classroom," but she "would not classify these as severe disruptions." (*Id.*) Ms. Hop

also noted Ms. Strong chose not to enroll M.H. in the school's behavioral program,

which Ms. Hop felt would have benefitted M.H. (*Id.*, 175.)

In the domain of Interacting and Relating to Others, which consisted of thirteen

performance categories, Ms. Hop found that M.H. had "a slight problem" in five

categories and "no problem" in eight categories. (R. 171-72.) Ms. Hop noted that due

to behavior problems in this category, M.H. often "had to be moved to another seat

away from the other children" and "has a hard time making and keeping friends." (R

171.) Finally, Ms. Hop reported that she did not observe any problems with M.H.'s

functioning in the domains of Moving and Manipulating Objects, Caring for Oneself, or

Health and Physical Well-Being. (R. 172-74.)

On May 28, 2008, Sarah Lamie, a social worker at the Helen Wheeler Center,

assessed M.H. and concluded she had ADHD. (R. 178-83.) Ms. Lamie noted that

M.H.'s reported behavior problems began upon entering second grade, roughly eight

months before their meeting. (R. 179.). Ms. Lamie noted that M.H. was "very respectful

during their meeting and agreed that her behavior needs to change so that she can

have friends." (R. 182.) Ms. Lamie recommended a psychiatric evaluation and

individual therapy to help M.H. process her feelings and emotions and improve her

4

behavior.  (R. 183.)

On June 24 and 25, 2008, Erwin Baukus, Ph.D., a clinical psychologist, conducted a psychological examination of M.H. and completed a report regarding its results.  (R. 262-65.)  After spending an hour with M.H. and evaluating her in various categories, Dr. Baukus concluded that M.H. had "no psychiatric diagnosis."  (R. 264.)

On July 3, 2008, A. Avva, M.D., of the Helen Wheeler Center, diagnosed M.H. with ADHD and assigned her a Global Assessment of Functioning score of 55.  (R. 276-78.)  Dr. Avva's Child and Adolescent Psychiatric Evaluation report notes that M.H. was referred by her school's social worker, and had a history of aggression, physical violence at school, difficulty listening and staying on task, defiance, and hyperactivity at home.  (R. 276.)  Dr. Avva also noted a report that M.H. wrote a letter to her mother saying she wanted to kill herself after her cell phone was taken away.  (*Id.*)  Dr. Avva found that M.H. had no suicidal ideation, but marked "abnormal" under the categories of "concentration," "energy level," and "high-risk behavior," and noted "impulsive" next to the last category.  (*Id.*)  Dr. Avva prescribed a trial of Focalin and recommended that M.H. continue therapy.  (*Id.*)

On July 28, 2008, Sean Strong, M.H.'s aunt,[2] filed an adult third party function report regarding M.H. with DDS.  (R. 185-92.)  She reported babysitting M.H. five times a week.  (R. 185.)  She noted that M.H. is unable to pay attention or sit for long periods of time, is easily distracted, does not follow instructions, and has trouble playing with other children because she is usually violent and kicks, bites, and hits them.  (R. 186,

---

[2]  We note that both the ALJ and the Commissioner mis-identified Sean Strong as M.H.'s "niece."  (*See* R. 20; Df.'s Resp. at 5 [29].)

188-89.)  Based on that "violent" behavior, Sean Strong noted M.H. cannot go outside alone and "need to be monitor [sic]."  (R. 187.)  She also wrote that sometimes, when M.H. "don't get her way she say's she gonna kill her self [sic]."  (R. 190.)  Sean Strong noted she was "very glad" M.H. was taking her medication, and that it "is a very good thing" that M.H. was going to therapy, because by doing so, M.H. became much calmer and easier for Sean Strong to babysit.  (R. 191.)

   In an August 7, 2008 progress report, Dr. Avva noted that M.H. had improved since her last visit.  (R. 317.)  Dr. Avva also wrote that M.H. claims her Barbies talk to her inside her head.  (*Id.*)  Dr. Avva found M.H. to be stable and responding well to treatment, and that M.H. herself reported she was doing "excellent."  (*Id.*)

   On August 12, 2008, Phyllis Brister, Ph.D., reviewed some of M.H.'s medical and other records at DDS' request, and completed a Childhood Disability Evaluation Form regarding M.H.  (R. 300-05.)  Dr. Brister found that M.H. had a marked limitation in the domain of Interacting and Relating to Others; less than marked limitations in the domains of Acquiring and Using Information and Attending and Completing Tasks; and no limitation in the remaining domains.  (R. 302-05.)  In her comments on the Interacting and Relating to Others domain, Dr. Brister noted that "[M.H.] is shown to have problems at school with disruptive behavior and has lost privileges because of this."  (R. 305.)  In her comments on M.H.'s less than marked limitation in the domain of Acquiring and Using Information, Dr. Brister wrote that M.H. has "some problems with math and working independently."  (*Id.*)  In her comments on M.H.'s less than marked limitation in the domain of Attending and Completing Tasks, Dr. Brister found that M.H. "has a hard time keeping quiet while working independently" and "often creates a disruption in the

classroom." (R. 302.) Dr. Brister ultimately concluded that while M.H. had a severe impairment or combination of impairments, she did not meet, medically equal, or functionally equal a Listing. (R. 300.) In making her assessment, Dr. Brister noted that "the ADLs [activities of daily living] provided by parent appear to credble [sic]." (R. 305.)

In a September 8, 2008 progress report, Dr. Avva noted that M.H. had improved since her last visit, had good grades, and was behaving well. (R. 314.) Dr. Avva also noted that M.H. had been off of her medication for the two weeks prior to the visit. (*Id.*) She reported that M.H. is suspicious that others are talking and laughing about or at her, and that M.H. still hears her dolls in her ears. (*Id.*)

On September 24, 2008, Mary Dominguez, M.H.'s third grade teacher, completed a Teacher Questionnaire for DDS. (R. 208-15.) At the time, Ms. Dominguez had known M.H. for one month and spent six hours a day, five days a week with her. (R. 208.) Ms. Dominguez rated M.H.'s reading skills "at grade level," her math skills as "average," and her written language skills as "below grade level." (*Id.*) She also rated M.H.'s performance in the six domains of functioning relevant to childhood disability determinations. In the Acquiring and Using Information domain, Ms. Dominguez found that M.H. had "a serious problem" in one category; "an obvious problem" in one category; "a slight problem" in four categories; and "no problem" in four categories. (R. 209.)

In the Attending and Completing Tasks domain, Ms. Dominguez found that M.H. had "an obvious problem," on a daily basis, in eight categories; "a slight problem," on a daily or weekly basis, in two categories; and "no problem" in three categories. (R. 210.) Ms. Dominguez reported that she did not observe any problems with M.H.'s functioning

7

in the remaining four domains of Interacting and Relating with Others, Moving and

Manipulating Objects, the Caring for Oneself, or Health and Physical Well-Being.  (R.

211-13.)  According to Ms. Dominguez, M.H. "does not have significant behavior

problems.  She can act poorly but has the ability to control it.  I do not feel her behaviors

cause *academic* problems *at all*." (R. 215 (emphasis in original).)

On October 1, 2008, at DDS' request, Joseph Mehr, Ph.D., reviewed some of

M.H.'s medical and other records, and completed a Childhood Disability Evaluation

Form regarding M.H.  (R. 367-72.)  Dr. Mehr found that M.H. had a less than marked

limitation in the domains of Acquiring and Using Information and Attending and

Completing Tasks, and no limitation in the remaining domains.  (R. 369.)  In his

comments on the Acquiring and Using Information domain, Dr. Mehr noted that M.H. "is

in a regular 3rd grade class and is working on grade level in reading and math.  She is

below grade level in wtitten language and has some difficulty with oral instructions [sic]."

(*Id.*)  In his comments on the Attending and Completing Tasks domain, Dr. Mehr noted

that M.H. "is on medication for ADHD," that "her teacher indicates she has some

obvious oproblems in this area [sic]," and that "her condition is stable and is responding

well to treatment." (*Id.*)  Dr. Mehr concluded that M.H. had a severe impairment or

combination of impairments, but that she did not meet, medically equal, or functionally

equal a Listing.  (R. 372.)  At the end of his report, Dr. Mehr wrote: "Allegations are

credible." (*Id.*)

In June of 2010, M.H.'s fourth grade teacher completed an unsigned and

undated Teacher Questionnaire for DDS.  (R. 235-43.)  At the time, that teacher had

known M.H. for ten months and spent six hours a day with her.  (R. 235.)  The teacher

8

did not rate M.H.'s reading, math, or written language skills, but did rate M.H.'s performance in the six relevant domains of functioning.  In the Acquiring and Using Information domain, the fourth grade teacher found that M.H. had "a very serious problem" in two categories; "a serious problem" in one category; "a slight problem" in two categories; and "no problem" in five categories.  (R. 236.)  In the Attending and Completing Tasks domain, the teacher found that M.H. had "a very serious problem," on an hourly basis, in two categories; "a serious problem," on an hourly basis, in one category; "an obvious problem," on an hourly or daily basis, in four categories; "a slight problem," on an hourly or daily basis, in two categories; and "no problem" in four categories.  (R. 237.)

In the Interacting and Relating to Others domain, M.H.'s fourth grade teacher found that M.H. had "a serious problem," on an hourly basis, in one category; "an obvious problem," on a weekly basis, in one category; "a slight problem," on a daily basis, in two categories; and "no problem" in nine categories.  (R. 238.)  The teacher noted that due to M.H.'s behavior in this domain, behavior modification strategies had been implemented: M.H. "has had timeouts due to the fact that she had difficulty staying on task.  She also would distract those around her." (*Id.*)  Finally, the teacher reported that she did not observe any problems with M.H.'s functioning in the Moving and Manipulating Objects, Caring for Oneself, or Health and Physical Well-Being domains. (R. 239-41.)

On September 10, 2010, M.H.'s attorney submitted a pre-hearing letter to the ALJ summarizing portions of the record and laying out his legal arguments.  (R. 244-48.)  While the letter discussed various teachers' reports, among other things, it did not

9

reference the reports Ms. Strong had previously provided to DDS.  (*Id.*)

**B.     Ms. Strong's Hearing Testimony**

At the September 15, 2010 hearing before the ALJ, Ms. Strong testified that M.H.'s behavior is intolerable at times and that she has aggressive behavior and becomes very agitated.  (R. 36, 37.)  Ms. Strong stated that M.H. had violence issues at school and problems with other students.  (R. 37.)  Ms. Strong also testified that M.H. took a paperclip apart at school and was going to fight another student with it.  (*Id.*)  At this point, however, the ALJ interrupted Ms. Strong's testimony, noting M.H.'s presence at the hearing as a concern.  (*Id.*)  The ALJ asked if Ms. Strong would affirm the information in her attorney's pre-hearing letter that summarized the attorney's arguments.  (R. 37.)  Plaintiff's attorney, Cody Marvin, agreed to have Ms. Strong affirm the attorney's letter.[3]  (*Id.*)  The ALJ also gave Mr. Marvin an opportunity to bring to the ALJ's attention any evidence not already in the record; Mr. Marvin directed the ALJ to M.H.'s report card from the prior year and her fourth grade Teacher's Questionnaire.  (R. 38-39.)

M.H. did not testify at the hearing before the ALJ.

**C.     Post-Hearing Suspension- and Expulsion-Related Evidence**

On September 30, 2010, fifteen days after the hearing before the ALJ, Ms. Strong received notice from M.H.'s school that M.H. had been suspended for ten days, with the possibility of expulsion, for having brought a screwdriver to school with intent to use it as a weapon.  (R. 250.)  Two business days later, in a letter dated October 4,

---

[3]  Mr. Marvin was from the Law Offices of Barry A. Schultz, the same law firm currently representing plaintiff.

2010, M.H.'s school notified Ms. Strong that M.H. had been recommended for expulsion, and that an expulsion hearing was scheduled for Friday, October 8, 2010. (R. 249.)  Ms. Strong's counsel electronically submitted both of those documents to the ALJ on October 6, 2010.  (R. 251.)  The ALJ issued his opinion on October 8, 2010, but his opinion does not reference either document or the events discussed therein.

## III.    LEGAL STANDARD

### A.    Standard of Review

As with an ALJ's decision concerning an adult, judicial review of a decision denying SSI benefits to a child claimant is limited to determining whether the ALJ applied the correct legal standards in reaching his or her decision, and whether there is substantial evidence to support the relevant findings.  *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001).  Thus, the court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "more than a mere scintilla of proof."  *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).  It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007).  In determining whether there is substantial evidence, the Court reviews the entire record.  *Kepple*, 268 F.3d at 516. However, our review is deferential.  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citation omitted).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks

evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539 (citations omitted). While the ALJ need not discuss every piece of evidence in the record, "[w]here an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (citation omitted).

### B.    Disability Determination

M.H. is not eligible for SSI benefits unless she is disabled under the Social Security Act. A child is disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Whether a child meets this definition is determined via a three-step inquiry. 20 C.F.R. § 416.924(a); *Murphy*, 496 F.3d at 633. First, if the child is engaged in substantial gainful activity, her claim will be denied. *Id.* Second, if she does not have a medically severe impairment or combination of impairments, her claim will be denied. *Id.* Third, the child's claim will be denied unless her impairment meets, or is medically or functionally equivalent to, one of the listings of impairments in 20

12

C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id*; 20 C.F.R. § 416.902.

To determine whether an impairment is the functional equivalent of a Listing, an ALJ must analyze its severity in six age-appropriate domains: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Oneself; and (6) Health and Physical Well–Being. 20 C.F.R. § 416.926a(b)(1). Functional equivalence exists, and a child qualifies for benefits, if the ALJ finds a "marked" difficulty in two domains of functioning, or an "extreme" limitation in one. 20 C.F.R. § 416.926a(d).[4] The evidence relevant to whether a child's limitations are marked or extreme involves both medical and nonmedical sources. 20 C.F.R. § 416.924a(b)(3). The latter may include information from parents, teachers, and other people who know the child, and their descriptions of relevant activities in school, at home, or in the community. 20 C.F.R. §§ 416.924a(b)(3), (e).

After noting that M.H. was a "school-aged child for purposes of disability evaluation" (R. 19), ALJ Stewart followed the required three-step analysis. He concluded M.H. satisfied the requirements at step one because she had "never engaged in substantial gainful activity." (*Id.*) At step two, the ALJ found that M.H. had a medically severe impairment, ADHD, which "causes more than minimal functional limitations." (*Id.*) At step three, the ALJ found that M.H.'s impairments did not meet, or medically or functionally equal, a Listing. (R. 19-25.) Specifically, the ALJ found that

---

[4] A "marked" limitation is one that "interferes seriously" with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation "interferes very seriously" with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

M.H. had less than marked limitations in the Acquiring and Using Information and Attending and Completing Tasks domains, and found she had no limitation in the remaining domains.  (R. 23-24.)

Plaintiff asks this Court to find that the ALJ erred in his analysis.  First, Ms. Strong argues that the ALJ committed reversible error by failing to make a proper credibility assessment of her testimony.  Second, Ms. Strong asserts that the ALJ failed to properly consider the report from M.H.'s fourth grade teacher.  Finally, Ms. Strong contends that the ALJ failed to properly evaluate M.H.'s limitations in the domain of Interacting and Relating to others by failing to consider certain evidence.  We address those issues below.

IV.    **ANALYSIS**

A.    **The ALJ Failed to Properly Analyze Ms. Strong's Credibility.**

Because the ALJ is in a superior position to judge credibility, the ALJ's credibility determination is entitled to "special deference."  *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (citation omitted).  However, the ALJ is still required to articulate his reasoning and discuss or distinguish relevant contrary evidence.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  Additionally, the ALJ must follow the requirements of Social Security Ruling ("SSR") 96-7p.  Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms of the underlying impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  SSR 96-7p also provides that an ALJ's "determination or decision must contain specific reasons for the finding on

14

credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, at *2.

Following its boilerplate statement regarding the necessity of making a credibility determination, the ALJ's opinion generally summarized, in four sentences, Ms. Strong's testimony and the disability reports she filed regarding her daughter's behavior. (R. 20-21.) However, the ALJ did not mention the evidence provided by Ms. Strong when addressing the limitations caused by M.H.'s impairments in the six functional equivalence domains. (R. 23-25.) Instead, he used Ms. Strong's statements to discredit other evidence supporting disability, stating that "some documents that appear to show significant behavior problems appear to be based on the statements by the claimant's mother and not on actual observation." (R. 22.) But at no point did the ALJ expressly address whether or not he found Ms. Strong to be credible. Similarly, he never discussed what weight he gave the evidence she supplied in her testimony or DDS reports, or why other evidence based on her statements deserved little to no weight.

The ALJ's failures in these respects violate the applicable regulation and Seventh Circuit precedent. SSR 96-7p, 1996 WL 374186, at *4 ("The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"); *Hopgood v. Astrue*, 578 F.3d 696, 700 (7th Cir. 2009) (remanding where the ALJ wrote

claimant's mother was "generally credible," but failed to explain why he did not find some of her testimony to be persuasive or to explain the reasons for his credibility finding for the benefit of subsequent reviewers); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007) ("Here, the ALJ did not make a credibility assessment as to [claimant's mother's] testimony, though the ALJ did recite some parts of the testimony. If [her] testimony was not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, [her] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [claimant] was markedly limited in attending and completing tasks.").[5]

The ALJ's mishandling of the credibility determination and evidence related to Ms. Strong is further underscored by the findings of two of the DDS consultants. Drs. Mehr and Brister found the allegations and reports of activities of daily living to be credible. (R. 372, 305.) While the ALJ referenced the exhibit number associated with Dr. Mehr's report when stating that the "conclusions reached by the physicians employed by [DDS]" deserve "some weight" (R. 22), at no point did the ALJ mention Drs. Mehr's or Brister's conclusions regarding credibility, much less discuss the weight

---

[5]  It also appears that the ALJ's ability to determine Ms. Strong's credibility may have been impaired by his decision to cut her hearing testimony short. (*See* R. 37.) Without evidence of an individual's demeanor, an ALJ generally cannot explain how or what he used to arrive at his credibility determination. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying."). Thus, an ALJ lacks an adequate basis for finding against a plaintiff's credibility where the ALJ denies plaintiff the opportunity to present testimony on his own behalf. *White v. Barnhart*, 235 F. Supp. 2d 820, 830 (N.D. Ill. 2002). We need not decide here whether Ms. Strong's limited hearing testimony satisfied the ALJ's obligation to develop a full and fair record, not least because other issues warrant remand, and because plaintiff's attorney at the hearing agreed to stand on the pre-hearing letter he prepared for the ALJ in lieu of Ms. Strong testifying further. (*See* R. 38.) However, on remand, we urge the ALJ to allow Ms. Strong a full opportunity to testify.

the ALJ afforded those credibility conclusions. (Indeed, the ALJ's opinion does not mention Dr. Brister's report, or its associated exhibit number, at all.) While an ALJ is not bound by any State agency findings, he may not ignore findings regarding credibility and must explain the weight given to them in his decision. SSR96-7p, 1996 WL 374186, at *8 ("[I]f the case record includes a finding by a State agency medical or psychological consultant or other program physician or psychologist on the credibility of the individual's statements about limitations or restrictions due to symptoms, the [ALJ] must consider and weigh this opinion of a nonexamining source under the applicable rules in 20 CFR 404.1527 and 416.927 and must explain the weight given to the opinion in the decision."). Further, the ALJ has a duty to discuss or distinguish relevant evidence contrary to his conclusion. *Clifford*, 227 F.3d at 870. As a result, the ALJ's failure to properly analyze Ms. Strong's credibility warrants remand.

### B. The ALJ Failed to Properly Address the Opinions of M.H.'s Teachers.

An ALJ must "consider all relevant evidence in the case record," and this includes opinion evidence from "other sources." SSR 06-03p, 71 Fed. Reg. 45593-03, at **45596. "Other sources" include "[e]ducational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers." *Id.* at *45594. SSR 06-03p notes "[o]ften, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." *Id.* at *45595. Additionally, SSR 06-03p provides that the ALJ "generally should explain the weight given to opinions from these 'other sources.'" *Id.* at *45596. The weighing factors set forth in 20 C.F.R. § 416.927 apply to such "other sources," and

include the nature and extent of the relationship between the source and the individual, the source's qualifications and area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, and whether that opinion is consistent with other evidence. *Id.* at 45595, 45596. Separately, the Seventh Circuit requires an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relied. *Giles*, 483 F.3d at 488.

Here, M.H.'s second, third, and fourth grade teachers each completed reports detailing their assessments of M.H.'s limitations in various domains. (R. 168-75, 208-15, 235-43.) While the ALJ summarized those opinions, he heavily relied upon those of M.H.'s third grade teacher, citing her report as support for each of his domain findings. (R. 23-24.) However, the ALJ failed altogether to discuss the second grade teacher's report in his domain findings, adopted some of the fourth grade teacher's opinions that supported his conclusions, and rejected or did not discuss others that were contradictory, all without ever articulating the weight he afforded the reports. (R. 23-24.)

The ALJ's failures to discuss the weight he afforded these reports, or his reasons for rejecting their contrary conclusions, warrant reversal here. By way of example, we find it curious that the ALJ relied so heavily on the third grade teacher's report, given that she prepared her evaluation after knowing M.H. for one month, while the second and fourth grade teachers prepared their reports after nine months and ten months of observation, respectively. *Cf.* 20 C.F.R. § 416.927(c)(2)(i) (listing length and frequency of interaction as factor to be used in evaluating weight of opinion evidence).

Additionally, while the ALJ relied upon the fourth grade teacher's opinions to support his conclusions that M.H. had no limitation in the domains of Moving About and

Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being (R. 24), the fourth grade teacher also found that M.H. had two very serious problems and one serious problem in the Acquiring and Using Information domain; two very serious hourly problems, one serious hourly problem, four obvious hourly problems, and two slight problems (one daily, one hourly) in the Attending and Completing Tasks domain; and a serious hourly problem, as well as an obvious weekly problem, in the Interacting and Relating with Others domain. (R. 236-378.) But the ALJ failed altogether to discuss much of this evidence contrary to his conclusions. (*E.g.*, R. 23 (no discussion of fourth grade teacher's report in ALJ's analysis of the Acquiring and Using Information domain).) Further, to the extent the ALJ considered some of that contrary evidence in his analysis of the Attending and Completing Tasks domain, he misstates – and thus appears to have underrated – the seriousness of the problems M.H.'s teachers identified. (*Compare* R. 23 (stating "her teachers have indicated *some obvious to serious problems* in this area") (emphasis added) *with* R. 237 (noting two very serious hourly problems, one serious hourly problem, four obvious hourly problems, and two slight problems, one daily, one hourly).) Further, the ALJ apparently relied on favorable progress notes to dismiss the contrary teachers' reports (*see* R. 23), without explaining how such notes *dating from 2008* could reflect "progress" from problems noted in *subsequently* dated reports.

Thus, we cannot conclude that the ALJ appropriately considered the "other source" evidence from M.H.'s teachers, and as a result, remand is warranted. *See, e.g.*, *Hopgood*, 578 F.3d at 700 (finding ALJ's analysis to be deficient because, among other things, he failed to explain why he did not credit teachers' reports finding that the

19

child had serious or obvious problems in the domain of Acquiring and Using Information); *Murphy*, 496 F.3d at 634-35 (reversing ALJ's decision where he "did not explain why he gave no weight to the portions of the school documents which support a finding that Nathan is disabled" and "did little to counter this evidence"); *Giles,* 483 F.3d at 487-88 (reversing ALJ's decision where he noted, among other things, that the child's teachers reported numerous attention problems but did not explain why such evidence was insufficient to find a marked limitation in Attending and Completing tasks).

### C. The ALJ Failed to Properly Evaluate or Articulate his Assessment of Other Important Evidence.

In denying benefits, the ALJ must "sufficiently articulate his assessment ... to assure us that [he] considered the important evidence." *Carlson*, 999 F.2d at 181. An ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate his analysis so that we can follow his reasoning. *Murphy*, 496 F.3d at 634; 20 C.F.R. § 416.912(d). "Thus, although the ALJ need not discuss every piece of evidence in the record, [he] may not ignore an entire line of evidence that is contrary to the ruling. Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted). Further, "[w]e require an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies." *Giles*, 483 F.3d at 488. Here, we find that the ALJ should rectify the following issues on remand.

First, and as noted above, two DDS medical consultants, Drs. Brister and Mehr, completed separate assessments of M.H.'s functioning levels in the six relevant

domains.  (R. 300, 372.)  Dr. Brister concluded in August 2008 that M.H. had a marked limitation in the Interacting and Relating to Others domain, while Dr. Mehr concluded in October 2008 that M.H. had a less than marked limitations in the Acquiring and Using Information and Attending and Completing Tasks domains.

Like Dr. Mehr, the ALJ concluded that M.H. had less than marked limitations in the domains of Acquiring and Using Information, and Attending and Completing Tasks. (R. 23.)  However, the ALJ did not mention Dr. Mehr's opinion when analyzing those domains.  Instead, the ALJ made only generic references to the DDS consultants' opinions, stating generally that they support his conclusion that M.H.'s impairment does not meet a Listing and his finding that she is "not disabled." (R. 19, 22.)  And while the ALJ specifically cited the exhibit containing Dr. Mehr's report when making the latter general statement, he gave no other indication he had considered Dr. Brister's opinion at all, and did not cite Dr. Mehr's report anywhere in his domain analyses.  (R. 22-25.) That is particularly problematic, given that Dr. Brister opined, contrary to the ALJ's conclusion, that M.H. had a marked limitation in the Interacting and Relating to Others domain.  In generically accepting some portions of Dr. Mehr's report, but failing altogether to address Dr. Brister's conflicting opinions, the ALJ failed to appropriately assess the DDS consultants' reports.  *See, e.g.,* SSR 96-6p, 1996 WL 374180, at *1 (July 1996) ("Findings of fact made by State agency medical and psychological consultants ... regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources .... [ALJs] ... may not ignore these opinions and must explain the weight given to these opinions in their decisions."); *Indoranto*, 374 F.3d at 474 (an ALJ must "confront the evidence that does

not support his conclusion and explain why it was rejected.").[6]

Second, the ALJ's opinion failed to discuss, much less distinguish, contrary record evidence pertinent to the Interacting and Relating to Others domain. As just noted, the ALJ did not address Dr. Brister's opinion that M.H. had a marked limitation in this domain. Further, while the ALJ noted early in his decision that M.H.'s school records from second grade contained "a number of discipline referrals for problem behaviors" (R. 16), he failed to acknowledge that a number of those referrals were for physical fights she instigated, or to mention that evidence, in his analysis of this domain. He also failed to address M.H.'s aunt's opinion that even with medication, M.H. has to be constantly monitored because she would hurt other children, and Dr. Avva's note from the last session of record that M.H. was "suspicious" and "feels strangers are talking and laughing about/at her." Rather, in concluding M.H. had no limitation in this domain, the ALJ wrote only that "[M.H.] herself reported that she attends church and Bible lessons and visits friends" to support his conclusion of no limitation. (R. 24.) On remand, the ALJ is reminded of his obligation to confront the evidence that does not support his conclusion and explain why he rejected it. *Indoranto*, 374 F.3d at 474.

Finally, the ALJ did not consider the evidence related to M.H.'s ten-day suspension and expulsion hearing. (*See* R. 21 (noting Ms. Strong "admitted that he daughter had some detentions, but had never been suspended or expelled from school [sic]").) We acknowledge that those events occurred after the hearing before the ALJ,

---

[6] We also note that both DDS consultants, when making their assessments, did not have the benefit of the most recent Teacher's Questionnaire. We respectfully suggest that on remand, the ALJ obtain additional medical source evidence that accounts for that Questionnaire, as well as any other pertinent evidence.

and that, by happenstance, plaintiff's apparently prompt submission of the related evidence occurred just two days before the ALJ issued his opinion. (R. 25, 251.) The decision whether to reopen the hearing to receive "new and material evidence" is discretionary to the ALJ. *McClesky v. Astrue*, 606 F.3d 351, 354-55 (7th Cir. 2010) (*citing* 20 C.F.R. § 404.944). Because other aspects of this case independently warrant remand, we need not decide whether it would have been an abuse of discretion for an ALJ to refuse to consider this post-hearing evidence. Instead, on remand, we respectfully instruct the ALJ to consider the evidence of suspension and possible expulsion when evaluating M.H.'s claim.

## V.    CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment [18] is granted in part and denied in part. This case is remanded to the Social Security Administration for proceedings consistent with this opinion. It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated: December 12, 2012

23